**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**Terri Gulner,** **Civil No. 00-2536 (SRN)**

**Plaintiff,**

v.

**ORDER**

**The City of Cottage Grove, Minnesota,**

**Defendant.**

---

Pamela Marie Miller, Esq., on behalf of Plaintiff.

Patricia Y. Beety, Esq., on behalf of Defendant.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-entitled matter came before the undersigned United States Magistrate Judge on March 14, 2002, on Defendant's Motion for Summary Judgment (Doc. No. 10).

Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, the parties waived their right to proceed before a United States District Judge, and voluntarily consented to have all proceedings in this case, including the entry of judgment, conducted and determined by the undersigned United States Magistrate Judge. On April 4, 2001, it was so ordered by the Honorable James R. Rosenbaum, Chief Judge for the United States District Court for the District of Minnesota.

## I. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT.

### A. Factual Background.

In the present case, Plaintiff has brought claims for: (1) sex discrimination based on

JUL 01 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD. JUL 01 2002
DEPUTY CLERK

pregnancy, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq., as amended by the Pregnancy Discrimination Act of 1978, 4n U.S.C. § 2000e(k); and (2) retaliation, in violation of Title VII of the Civil Rights Act, as amended by the 1991 Civil Rights Act. (Complaint.) The facts leading to the Complaint occurred as follows:

**1. Initial Employment.**

On October 12, 1998, Plaintiff was hired by Defendant as a Secretary I in the Ice Arena/Recreation Divisions. (Ex. B; 10/02/98 Memo to Mayor and City Council.) Plaintiff's position required her to perform general clerical work for 20 hours per week in the Ice Arena and 20 hours per week in the Recreation Department. (Ex. A; Deposition of Terri Gulner (Gulner Depo.) at 24-25.) Half of Plaintiff's salary was funded by the Recreation Department fund, and half by the Ice Arena fund. (Ex. C; Deposition of Ryan Schroeder (Schroeder Depo.) at 22.)

Plaintiff was informed that her employment would begin with a one-year probationary period, during which her performance would be evaluated and reviewed. (Gulner Depo. at 36.) At the end of the probationary period, there was to be an evaluation of whether to keep Plaintiff on as a regular employee. Id. at 37.

**2. Plaintiff's Informal Complaint.**

At some point in December 1998, Plaintiff spoke with her Ice Arena supervisor, Dean Mulso, to complain about her supervisor in the Recreation Department, Diane Evans. Id. at 40. Plaintiff stated that Evans would make belittling comments, and "would try to stir up problems." Id. at 41. Plaintiff also described the work environment at degrading. Id. at 44-45. Mulso passed the complaints on to his supervisor, John Fredrickson, who was the City's Parks and Recreation Director. Id. Fredrickson met with Plaintiff to discuss her complaints. Id. Plaintiff

then arranged to meet with Evans directly. Id. at 46. Plaintiff told Evans that she was offended by the things that were being said and done to her, including being excluded from meetings. Id. at 46-47. Although Plaintiff believed the meeting ended on a good note, she states that nothing changed as a result. Id. at 48.

In February 1999, Evans approached Michelle Wolfe, Assistant City Administrator, who handled the City's human resource functions. (Ex. D; Deposition of Michelle Wolfe (Wolfe Depo.) at 56.) Evans told Wolfe she was having difficulties with Plaintiff's work performance, and wanted to know if it would be appropriate to conduct a performance evaluation in conjunction with Mulso. Id. at 56-57. Wolfe provided Evans with an evaluation form and stated that an evaluation would be appropriate for all new employees. Id. at 57. The evaluation was not conducted, however, because of Plaintiff's subsequent formal complaint. Id.

### 3. Plaintiff's Formal Complaint.

On February 28, 1999, Plaintiff discussed with Joanne Bixby, a representative in the clerical bargaining unit, whether she should bring her complaints to Wolfe's attention. (Gulner Depo at 51-52.) Then, on March 1, 1999, Plaintiff filed a formal complaint with Wolfe concerning the issues in the Recreation Department. Id. Wolfe described the complaint as follows:

> Basically she said she was - - she said she liked what she was doing but she was very unhappy in the recreation division. She said that - - As I recall, the complaints consisted of a larger - - There was a larger number of them, and it included things like they don't say hi to me; they criticize my hair and my clothing; they criticize my work more than she felt was appropriate. She alleged that they did something called going to the board on a daily basis for hours at a time; and she alleged that when they did that, it was really just a lengthy gossip session. She stated she felt they were not using budgeted funds appropriately and that they made

> purchases that she viewed, my word, frivolous; but that's, I think, the best way to describe what she was alleging. She gave a lot of examples of things that she thought weren't appropriate, such as conversations that she said she had with Dean Mulso.
>
> She felt that Diane Evans put her in a bad position between Dean and Diane in that they argued about her hours worked and where she worked them. She mentioned that she felt her probationary status had been threatened by Diane and that she had been given a hard time when she had made requests for time off. I - - At the moment, you know, that's a pretty - - pretty full description of some of the complaints that she mentioned.

(Wolfe Depo. at 7-8.)

Wolfe asked Plaintiff at that time whether she felt there had been contract violations (violations of the collective bargaining agreement between the City and her unit), or if she felt any of the comments were discriminatory in nature. Id. at 10-11. Plaintiff answered no to these questions. Id. Wolfe states that when she asked Plaintiff what remedy she was seeking, Plaintiff responded that she wished to be removed from the Recreation Department. Id. Wolfe informed Plaintiff that she could not remove her immediately on the basis of her report, but that she would "do everything that I possibly could to keep the environment as professional as possible and to keep the investigation separate from her workday." Id.

After the meeting with Plaintiff, Wolfe requested a meeting with City Administrator Ryan Schroeder, and Parks and Recreation Director John Fredrickson. Id. at 9-10. Wolfe reviewed Plaintiff's complaint with them, and Schroeder then directed Wolfe and Fredrickson to conduct an investigation into her allegations. Id. at 10. Over the next several working days, Wolfe and Fredrickson conducted interviews with the employees they believed would know about the subject matter of the complaints. Id. Wolfe summarized the findings from her investigation as follows:

> And after concluding all of these interviews and reviewing all the information, it was my conclusion that there wasn't any support that I could find for the complaints that Terri had made as actually having occurred and that, if anything, there were misunderstandings or things taken out of context and so forth, but nothing that I could substantiate basically.

Id. at 21.

#### 4. Plaintiff Mentions her Pregnancy.

On March 10, 1999, Wolfe met with Plaintiff and discussed her investigation. Id. at 25. Wolfed stated that she could not find any basis to substantiate the complaints, but she did not believe Plaintiff was dishonest, and instead believed there had been misunderstandings, misperceptions, and personality conflicts. Id. at 25-26. Wolfe told Plaintiff that "given her statement to me that she did not want to work in the recreation division, I felt her only options at that time were to resign if she wasn't happy working for the city or to maintain her position at the ice arena and go to part-time status." Id. at 26. Wolfe also explained that Plaintiff could work up to 30 hours per week in the Ice Arena and receive part-time benefits. (Gulner Depo. at 62.) When Plaintiff responded that she wished to maintain a full-time position, Wolfe stated that she might also be able to maintain her current position, but that option would require "quite a bit of employee assistance, team building, and other types of things to try to repair the relationships." (Wolfe Depo. at 28-29.) At the same time that Plaintiff told Wolfe she wished to continue working full time, she also informed Wolfe that she was pregnant. Id. Plaintiff did not choose an option at that time, but requested information on part-time benefits. Id.

During the meeting, Wolfe informed Plaintiff that she was not the final authority for the City. Id. at 30. Wolfe directed Plaintiff to Schroeder, stating that he had an open-door policy, and that he would meet with Plaintiff if she desired that. Id. On March 11, 1999, Plaintiff met

with Schroeder and told him she did not feel her complaints had been taken seriously, and that a proper investigation had not been performed. (Gulner Depo. at 67.) Schroder explained that "at that point in time I was tending towards believing that there was something, you know, to her issues. I thought that she had complaints that ultimately, you know, might be founded as having some merit." (Schroeder Depo. at 78.) Schroeder also stated that he attempted to convey that her employer took her issues seriously. Id. During this meeting, however, Plaintiff had not selected a particular option, because she had not had a chance to consider them. (Gulner Depo. at 67-68.)

During her deposition, Plaintiff was asked whether Schroeder had discussed his former employment positions with her during the interview. Plaintiff responded to this question as follows:

> Yes, that he worked for the City of Robbinsdale and the City of Ramsey. And Robbinsdale, he said they didn't like him there, and he was an asshole, and that was his job to be an asshole. If I could call them that they would all say that, and that is all I can recall. When he said that he was referring to – my comment was, well, is that Diane Evans' position her, her job to treat people like that, or me like that?

Id.

**5. Schroeder Removes the Option of Returning to the Recreation Department.**

On March 16, 1999, Wolfe and Schroeder met with Plaintiff and informed her they were going to investigate her complaints further. Id. at 70; (Wolfe Depo. at 30-31.) They also instructed Plaintiff to take paid administrative leave for March 17 and 18, the days she was scheduled to work in the Recreation Department, so that they could complete this investigation. Id. On March 19, 1999, Plaintiff met with Wolfe and Schroeder. Id. at 72-73. They asked Plaintiff to choose between part-time work in the Ice Arena, for which she would receive full-

time benefits for the next three months, and ceasing employment altogether. Id. Plaintiff replied that she was seven months pregnant and needed a position with benefits, and, consequently, wished to work things out in the Recreation Department. Id. Schroeder informed her that working in the Recreation Department was no longer an option. Id.

Plaintiff chose to continue her part-time position in the Ice Arena. (Ex. F; March 29, 1999 Statement of Grievance (Statement of Grievance).) The City increased Plaintiff's hours to 22 per week, so that she would continue to receive part-time benefits at the end of her three additional months of full-time benefits. (Wolfe Depo. at 98.)

**6. Plaintiff's Formal Grievance.**

On March 29, 1999, Plaintiff filed a formal grievance pursuant to her union contract. (Statement of Grievance.) In the grievance statement, Plaintiff sought as a remedy "[t]o be reinstated immediately to a permanent full-time position with the City of Cottage Grove **not relating** to the Recreation Department[1], and the reimbursement of all lost wages and benefits, and the elimination of any remaining probationary time." Id. (emphasis in original). Plaintiff further stated that she had been subjected to pregnancy discrimination and would be filing charges of unlawful discrimination with the Equal Employment Opportunity Commission (EEOC) and the Minnesota Department of Human Rights (MDHR). Id. Plaintiff subsequently filed a charge of discrimination with the MDHR on June 14, 1999. (Exhibit G; June 14, 1999 Charge of Discrimination.)

Prior to filing the charge with the MDHR, Plaintiff consulted an attorney, who wrote a

[1]During her deposition, Plaintiff also answered yes to the question, "so all through your grievance you were requesting a nonprobationary full-time position outside of the recreation department?" (Gulner Depo. at 84.)

letter to Schroeder. Schroeder explained the letter and his reaction to it as follows:

> Terri had – Well, an attorney other than your own firm sent me a letter on behalf of Terri Gulner. In that letter this reference was made regarding the conversation that I had with Terri Gulner. That letter was stating that – in summary fashion that Terri had been wronged by the employer and as a result of that that compensation should be provided to – not compensation – payment should be made to Terri Gulner as a result of those wrongdoings. And as part of that the attorney stated that, you know, I made reference to myself as being an asshole; that that was troubling to him; and that, as a result of that, you know, I should react in some positive fashion – my words, not his – regarding Terri and her issues. I immediately took that letter to council within a day or two or three of when I received it, frankly, because I felt that it defamed me and disparaged my character. And I saw it as threatening and, frankly, I'd use the word blackmail. And if an attorney was going to take that position, I wanted to make sure my employer was aware of it. So I made my employer aware of it at my earliest opportunity and certainly would have informed them at the meeting that I took that to and in any conversations that I would have had at that same time of that comment and of that allegation toward myself.

(Ex. 3; Schroeder Depo. at 81-82.)

During her deposition, Plaintiff was asked, "[a]fter the investigation was concluded, did you want to be in that recreation department?" (Ex. 5; Gulner Depo. at 83.). She answered this question by stating "[w]ith proper resolution to the harassing behavior, absolutely." Id. Plaintiff also discussed her request not to be returned the Recreation Department. She explained that "[o]n March 23rd I went into the hospital and was hemorrhaging from being pregnant. And the emotional stress surrounding what was happening at the City and at that time made the decision not to go back into that department, no matter what the case. Prior to that I wanted my job." Id. at 85. In addition, the record contains a handwritten, undated letter addressed to "To whom it may concern, " in which Bixby states that she was present at the meeting between Plaintiff and Wolfe. (Ex. 8; Letter To Whom It May Concern.) In this letter, Bixby states "[a]s far as I

understand Terry wanted to stay in her job as she likes the work and has a dedication to the City as an employee and citizen. Terry wanted to be treated in a manner respectful of her skills she brought to her job and be treated fairly." Id.

Schroeder also discussed Plaintiff's complaint against Evans with City Council Member Cheryl Kohls. (Ex. 1; Deposition of Cheryl Kohls (Kohls Depo.) at 33.) After participating in the investigation of the complaint, Kohls states that "[m]y conclusions are that employees or former employees felt that there were some issues there and that there generally were some working conditions that were uncomfortable and that it wasn't a pleasant place to work."[2] Id. at 37-38. Kohls was then asked whether she believed Plaintiff's pregnancy played a role in the manner in which Schroeder handled the complaint. This led to the following exchange:

Q What I'm asking is, did he say things or did you learn things that caused you to believe that Gulner's pregnancy played some role in the way her complaint and her job situation was handled?
A Yes.
Q Tell me what you believed and what conclusions you came to in that regard.
A The first call I received on this issue was from Mr. Schroeder. We had never – I had no idea anything was going on at the time. Don't ask me when this call was because I don't recall. But the first call I got he explained that we had an employee issue and it was a split duties and there was a hostile work environment claims of and in that conversation he made the statement that she is pregnant. He just informed us she was pregnant.
Q Okay.
A And I thought that was – your intuition or your antenna go up. You know, something just happens. And I thought that was an odd thing to state in that conversation.
Q Did you have any – any other further conversations with

---

[2]The record contains additional statements from formal employees Megan Lester and Donna Winkler describing significantly difficult working conditions.

Mr. Schroeder on that same subject?
A Not that I recall.
Q Were there any other conversations that you had with anybody or any inquiries you made that led you to believe that Gulner's pregnancy may have had some role in the way her employment situation changed?
A Not that I recall.

Id. at 40-41.

Kohls also made this statement during her deposition:

> During the process at some point it occurred to me that there was a connection between Terri's pregnancy and potential medical bills or claims and our insurance premiums. I cannot and will not say that she was terminated because of that. And I did tell her that was simply my opinion and that it had occurred to me.

Id. at 29.

In addition, Kohls was asked whether Schroeder had been candid with the MDHR during its investigation. This led to the following exchange:

Q Do you recall whether or not you ever told Ms. Sheppard that you felt that Mr. Schroeder or other city staff weren't being candid or truthful with what they were stating?
A I may have said that, yes.
Q What did you believe, as far as you recall today, that Mr. Schroeder or others at the city have said that have not been fully forthcoming or truthful?
A I remember reading something – and I don't recall if it was a legal document or a letter or what, but I do remember reading something that Mr. Schroeder denied the comment about it's my job to be ... And all I know – I cannot say that he said that to her, but he did say that to me.
Q And the comment – so I'll fill it in. My job is to be an asshole –
A Right.
Q – is that the comment you're talking about?
A Uh-huh. Ask me the question again. Did – something about forthcoming of information.
Q Sure. What I'm –
A I'm not sure I –

Q What I'm asking about is sort of a follow-up in what might have been said to the human rights department. But did you ever come to a belief that the city, that Mr. Schroeder or others in the city had not been forthcoming or truthful in their answers or their responses regarding the Gulner situation?
A Yeah, I guess I won't say any more than that. I believe I did say that. And – yes I do believe that.
Q Other than the issue – the statement rather about – about asshole that Mr. Schroeder said to you, is there any other specific statement or subject that as stated that – by the city that you believe has not been complete or truthful in terms of the Gulner situation that you can recall as you sit here today?
A Not that I can recall as I sit here today.

Id. at 56-57.

Kohls also discussed the creation of another position in the proposed budget. This position was apparently titled recreation program assistant. Kohls described her reaction to the position as follows:

A What had happened is we had on the council agenda budget amendments for the ice arena, and the night before the meeting I called Jim Walcott about several issues just to bounce things off him and that sort of thing. I asked him if he knew anything about what I had perceived to be the creation of a – I don't know what the – clerical type position, if he knew anything about that. And he told me that he questioned that also and that he talked to Michelle Wolfe and was told that it was a clerical type position at the ice arena. . . . Okay, the best I can recall, I asked Council Member Walcott what he knew about that, and he said he questioned it as well and talked to Michelle Wolfe and she said that it was – the name was changed due to legal matters.
Q The legal issue involving Terri Gulner?
A Yeah.

Id. at 22-24.

**7. Dismissal of Plaintiff's Complaint.**

The MDHR conducted an investigation, and on June 15, 2000, it dismissed the charge

after finding that no probable cause existed to believe that the City had engaged in unfair discriminatory practice. (Ex. H; MDHR Dismissal of Charge of Discrimination.) The MDHR Dismissal included the following factual determination:

> Evidence, including witness statements and Charging Party's grievance, tend to support Respondent's contention that Charging Party, at least initially, told Respondent administrators she felt she could not return there; evidence also indicated that for nondiscriminatory reasons relating to the functioning of that division, those administrators were predisposed not to return a complaining employee to that office.

Id. Plaintiff's union informed her that it could not pursue her grievance to arbitration or mediation because it was not a recognized union that was paying dues. (Gulner Depo. at 115-16.)

**8. Reorganization of the Ice Arena.**

On June 21, 1999, Mulso resigned from his position as manager of the Ice Arena. (Ex. I; Personnel Action Form of Dean Mulso.) After Mulso resigned, the City Council began discussions over whether to fill the vacant position. (Schroeder Depo. at 27-28.) The City Council ultimately decided not to fill the vacancy. Id. Schroeder explained that since he was hired in 1997, there had been an "ongoing review of every operation whenever we have the opportunity to do that." Id. at 33. In addition, Schroeder explained that "we started reviewing maintenance issues related to the ice arena sometime in 1998, and we started reviewing financial issues also in early 1998." Id.

In an August 17, 1999 memo to the public works personnel, Schroeder documented that "[t]he Ice Arena operation had been running operating deficits for a number of years. Over the past three years (1996 to 1998) total losses have been $262,212. As a result of this bleak

financial situation it was determined that operational changes must occur in an attempt to improve the fiscal future of the Arena." (Ex. J; Memo to Public Works Personnel.) Between the years 1992 and 1998, the Ice Arena had also been requiring yearly subsidies from the City's General Fund. These subsidies ranged from $30,000.00 to $81,100.00 per year. (Ex. K; Summary of Ice Arena Operating Results.)

In a July 6, 1999 memo to the Mayor and City Council, Wolfe proposed to present the outline of a draft business plan for the Ice Arena during a workshop session on July 7, 1999. (Ex. M; 7/06/99 Memo to Mayor and City Council.) Wolfe stated that if the Mayor and City Council agreed with the concept, she would present a final version of the business plan at the July 21, 1999 City Council meeting. Id. The minutes from the July 7, 1999 workshop record the following events:

> Assistant Administrator Michelle Wolfe gave a verbal presentation on a conceptual proposal to consolidate the ice arena and recreation divisions and relocate recreation personnel to the Ice Arena. Wolfe reviewed the current structure of both operations, the proposed consolidated structure, a comparison of personnel costs, the five-year budget outlook, and the advantages and disadvantages to consolidation.
>
> Following discussion, Council directed staff to provide them a copy of the overheads utilized during the presentation and to obtain feedback from the School District and Cottage Grove Athletic Association of current Ice Arena operations. It was also directed that Staff look at other options, including selling the arena to the School District, CGAA, or to a private entity, or to hire a private management firm to operate the arena. Council consensus was to discuss the concept at a future Workshop Session.

(Ex. N; July 7, 1999 Minutes.)

Following the workshop, the City Council directed staff to obtain more information on the current Ice Arena operation, and to review different organizational options. (Schroeder Depo.

at 43-44.) Specifically, the City Council directed the staff to analyze staffing complements at other ice arenas in the region. Id. As a result, City Management Analyst Steve Barrett performed an analysis and issued a report. Id. at 42.

At the July 21, 1999 meeting, Schroeder used Barrett's data and presented the City Council with a list of 10 options that were currently under consideration for the Ice Arena. (Ex. O; Notes from July 21, 1999 Meeting.) These options included, amongst other things, recruiting a new arena manager, combining the Ice Arena, Recreation Department, and other departments into a new Parks and Recreation Department, outside the purview of Public Works, and ceasing to operate the Ice Arena. Id.

The minutes record that after a brief discussion, "Council consensus was to direct Staff to begin the process of recruiting a manager." Id. But after this statement, the minutes record that,

> Burshten strongly encouraged the City Council to consider some of the other options, especially option #5. The two full-time employees at the arena could be given more responsibility and hire an additional maintenance person. The maintenance person could be assigned to work nine months at the Arena, and three months at Public Works. Under this option, the Assistant Public Works/Parks & Recreation Director, John Fredrickson would oversee the Ice Arena.

Id. Walcott then asked the staff to return at the August 11, 1999 meeting with a report on the options. Id.

In a July 23, 1999 memo to the Ice Arena staff, Fredrickson described the meeting as follows:

> The Council began the discussion by suggesting that staff proceed with the hiring of a new Ice Arena manager.
>
> The Council made it very clear to staff that they collectively were opposed to moving the Recreation Division to the Ice Arena.

> Les Burshten introduced another option to their consideration before moving ahead with the recruitment of a new manager. He stated that with the many years of operational experience possessed by John and Dave, an additional full time manager might not be the best option at this time. He informed the Council that both he and I supported the idea of adding an additional full time person. This person would work at the arena afternoons, evenings and weekends, from roughly October 1st to April 1st. This individual would then be assigned work with Public Works in the Park Maintenance Division for the remainder of the year performing various tasks such as landscape maintenance, tree trimming, trail maintenance and other park maintenance duties. Secretarial services would continue to be provided on a 20 hours per week basis at this time, as is the current practice.
>
> Under this proposal, I would dedicate a set amount of hours each week at the Arena to assist in performing administrative duties with particular emphasis in the areas of budget management, contract management, personnel management and program development.

(Ex. 15; July 23, 1999 Memo to Ice Arena Staff.)

On July 30, 1999, Schroeder sent a memo to the Mayor and City Council describing the 2000 budget. (Ex. 17; 2000 Budget Memo.) In this memo, there was no mention of eliminating Plaintiff's position. On August 5, 1999, Schroeder presented a more detailed report that Barrett had compiled. (Ex. P; August 5, 1999 Ice Arena Staffing Options Report.) The report contained analysis of other ice arena operations, including the observation that "most arenas in the surrounding area employ a manager, assistant manager, maintenance personnel, and part-time seasonal employees. None of the arenas in the surrounding area employ a secretary." Id. The report outlined goals for the future of the Ice Arena and the City's public works department. Id. In addition, it included the following seven staffing options:

> (1) Recruit a new Arena Manager and continue as in the past.
> (2) Combine the Ice Arena and Recreation divisions. The Recreation Supervisor would manager the arena, with the

addition of a Recreation Programmer and an Accounting Clerk I.

(3) Promote the Assistant Arena Manger to manage the arena.

(4) Promote the Arena Maintenance Technician to manage the arena.

(5) Have the Assistant Public Works Director/Parks and Recreation Director manage the arena, with the following staffing options:

A. No additional employees.

B. Backfill savings by adding a Recreation of Arena Programmer.

C. Backfill savings by adding a Public Works Superintendent.

D. Backfill savings by adding a Pubic Works Technician.

E. Backfill savings by adding a Management Analyst.

F. Backfill savings by adding a Public Works Laborer to work in the arena and in Public Works, depending on seasonal needs.

(6) Combine the Ice Arena, Recreation, Parks, and River Oaks Golf Course to form a new Parks, and Recreation Department, outside the purview of Public Works.

(7) Outsource arena activities with the following options:

A. Sell the arena.

B. Turn over management of the arena to an outside party, or sublet the premises.

C. Cease operating the arena altogether.

Id.

Previously, on August 3, 1999[3] Schroeder sent a memo to the Mayor and City Council recommending option 5(f). (Ex. Q; August 3, 1999 Memo to Mayor and City Council.) In his memo, Schroeder also explained that,

> Clerical assistance, as is the case in all other local arenas would be gained from other Public Works personnel at either the Maintenance facility (as is the case with clerical assistance for the

---

[3]It is not clear how this memo could have been sent on August 3, 1999, and yet refer to a recommendation that the Mayor and City Council had already received, given that the recommendation is dated August 5, 1999.

> Golf Course) or from within the Recreation office. The primary utilization of these services would be with brochures, flyers, and the like. Other tasks presently completed at the Arena but available for completion in other ways are time card, purchase orders and ice scheduling. Time cards would be completed by full and part time staff with review by John Fredrickson. John Fredrickson would complete purchase orders. John Fredrickson, other full time arena staff, and part time building supervisors would conduct arena scheduling. These changes allow for savings beyond that shown within the report for this option 5(f).

Id.

Schroeder states that Plaintiff's probationary status played no role in his decision making, and was never discussed with the City Council. (Schroeder Depo. at 52.) On August 11, 1999, the City Council met and agreed by unanimous vote to accept Schroeder's recommendation of option 5(f). (Ex. S; August 11, 1999 Regular Meeting Minutes.) The meeting minutes record no discussion of the elimination of Plaintiff's position. Id.

On August 17, 1999, Schroeder sent a memo to the public works personnel informing them of the Ice Arena reorganization, including that it would result in the elimination of the existing clerical position as of September 3, 1999. (Ex. J; August 17, 1999 Memo to Public Works Personnel.) Schroeder did not recommend to the City Council eliminating any other positions as part of these reorganization plans. (Ex. 3; Schroeder Depo. at 58.) Wolfe states that the City continued to pay Plaintiff's salary through the end of September 1999, "on the basis of being available to John Fredrickson for assistance and information.[4]" (Wolfe Depo. at 42.)

### 9. Plaintiff Files Charge of Reprisal.

On December 17, 1999, Plaintiff filed an amended charge with the MDHR, to include a

[4]Wolfe was apparently interrupted with another question during her deposition, and never completed this statement.

claim of reprisal. (Ex. T; December 17, 1999 Charge of Discrimination.) On June 13, 2000, the MDHR dismissed this charge. (Ex. H; MDHR Dismissal of Charge of Discrimination.) The MDHR explained the dismissal of this charge as follows:

> The weight of the evidence supports Respondent's nondiscriminatory basis for Charging Party's loss of her ice arena position, i.e., the position of ice arena manager was eliminated after the incumbent resigned, as was the permanent, part-time clerical support position held by Charging Party until her termination. Insufficient evidence was found to show that the position, in fact, continued to exist following Charging Party's departure or that the reason given by Respondent was pretext for sex discrimination or reprisal for bringing a human rights charge against Respondent, or otherwise opposing a discriminatory practice.

Id.

## II DISCUSSION

### A. Summary Judgment Standard.

Summary Judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "Once the moving party shows that there are no material issues of fact in dispute, the burden shifts to the nonmoving party to set forth facts

showing that there is a genuine issue for trial." Donovan v. Harrah's Maryland Heights Corp., 289 F.3d 527, 529 (8th Cir. 2002) citing Celotex, 477 U.S. at 323. "In opposing a motion for summary judgment, the nonmovant must make a showing that, if reduced to admissible evidence, would be sufficient to carry the nonmovant's burden of proof at trial." Celotex, 477 U.S. at 323

> We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred.

Celotex, 477 U.S. at 324.

> [T]he Court understands *Celotex* to require information presented in opposition to summary judgment to be substantively admissible, even if the actual form of the information is not. This view is in accord with several other Circuit Courts of Appeals. *See Thomas v. International Business Machines*, 48 F.3d 478, 485 (10th Cir.1995) ("To be sure, the nonmoving party need not produce evidence in a form that would be admissible at trial, but the content or substance of the evidence must be admissible.") (citing *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267-68 (7th Cir.1994); *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) (stating that hearsay testimony that would be inadmissible at trial, may not be included in an affidavit to defeat summary judgment).

International Ship Repair & Marine Services, Inc. v. St. Paul Fire & Marine Ins. Co., 906 F. Supp. 645, 649 (M.D. Fla. 1995).

## B. Plaintiff's Substantive Burden.

### 1. Pregnancy Discrimination.

"To prevail on a pregnancy discrimination claim, a plaintiff has the burden to show that

she was 'treated differently because of her pregnancy' or a pregnancy-related condition." Scheidecker v. Arvig Enterprises, Inc. 122 F. Supp.2d 1031, 1040 citing Deneen v. Northwest Airlines, Inc., 132 F.3d 431, 435 (8th Cir. 1998). If a plaintiff lacks sufficient direct evidence, she must rely on indirect evidence, and her claims are analyzed under the burden-shifting analysis put forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), and clarified by St. Mary's Honor Ctr. V. Hicks, 509 U.S. 502 (1993). See Bergstrom-EK v. Best Oil Co., 153 F.3d 851, 857 (8th Cir. 1998)

Under this approach, a plaintiff is required to make out a prima facie case by presenting evidence to demonstrate that: "(1) she was a member of a protected group; (2) she was qualified for her position; and (3) she was discharged under circumstances giving rise to an inference of discrimination." Id. If the plaintiff makes out a prima facie case, the burden of production shifts to the defendant "to offer a nondiscriminatory reason for its action." Id. If the defendant offers a nondiscriminatory reason, the burden shifts back to the plaintiff to show that "she has sufficient admissible evidence from which a rational factfinder could find that [the defendant's] proffered reason was false or not the real reason for its action, and that intentional discrimination was the real reason." Id. at 857-58.

**2. Retaliation.**

To make out a prima facie case of retaliation, a plaintiff must show that: (1) she complained of discrimination; (2) her employer took adverse action against her; and (3) the adverse action was causally related to her complaint. See Smith v. St. Louis University, 109 F.3d 1261, 1265-66 (8th Cir. 1997). "If plaintiff makes out a prima facie case of retaliation, the employer must articulate a legitimate, nondiscriminatory reason for its actions. If the employer

meets that burden, plaintiff must prove that the proffered reason is pretextual." Rath v. Selection Research, Inc., 978 F.2d 1087, 1089-90 (8th Cir. 1992) citing McDonnell Douglas, 411 U.S. 792 (1973), and Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981).

## C. The Parties' Positions.

### 1. Pregnancy Discrimination.

Defendant states that Plaintiff has failed to make out a prima facie case of pregnancy discrimination. Or, in the alternative, if the Court finds Plaintiff has made out a prima facie case, Defendant argues that it has rebutted any presumption that it discriminated against Plaintiff. Defendant states that Plaintiff's case is entirely based on the timing of events, and she can not present any actual evidence that she was subjected to different treatment based on her pregnancy, and, therefore, Defendant is entitled to summary judgment. Defendant argues that Plaintiff "is unable to show that either the reduction in hours or the position elimination involved circumstances giving rise to an inference of discrimination." Defendant explains that it eliminated the option of returning to the Recreation Department because the working relationship between Recreation Department employees and Plaintiff had deteriorated.

Defendant observes that Plaintiff's own complaint against the Recreation Department did not involve charges of discrimination. In addition, Defendant stresses that it conducted a complete investigation of this complaint. Finally, Defendant also increased Plaintiff's part-time work in the Ice Arena to 22 hours per week, which exceeded the budget allotment for her position, so that she would be eligible for benefits.

With respect to restructuring the Ice Arena, Defendant states that there are no facts that give rise to an inference of pregnancy discrimination. Defendant recounts that the Ice Arena had

suffered significant financial difficulties for years prior to the restructuring. Further, Defendant was experiencing difficulties keeping the ice sheet frozen. Defendant explains that Mulso's resignation presented the opportunity to review these difficulties. This process revealed that Defendant's was the only ice arena that did not borrow secretarial staff from other departments. According to Defendant, the eventual proposal to eliminate the Ice Arena Manager, have the City's Assistant Public Works Director/Parks and Recreation Director manage the arena along with his other duties, and eliminate Plaintiff's position, was a money-saving proposal. Defendant concludes that "Plaintiff can present no evidence that the City Council's actions in this restructuring took into account her pregnancy." Defendant also emphasizes that Schroeder's August 5, 1999 memo to the City Council informed it that Plaintiff's position would be eliminated, and no City Council members have stated they were unaware of this fact.

Furthermore, Defendant notes that Kohls denied that Plaintiff was terminated because of potential insurance costs associated with her pregnancy. In addition, Defendant explains that its short-term disability insurance, and its medical insurance policy have no cap. Moreover, Plaintiff was not covered under the City's medical insurance at the time. Consequently, "her pregnancy would have no effect on premiums." Therefore, Defendant concludes that Plaintiff has failed to show this nondiscriminatory explanation for eliminating Plaintiff's position was false.

Plaintiff responds that there are genuine issues of material fact with respect to pregnancy discrimination, and summary judgment is inappropriate. Plaintiff asserts that the option of returning to the Recreation Department was removed only after Defendant learned of her pregnancy. She states that nothing else changed between the time she was offered all three options and when Defendant subsequently informed her that she could no longer return to the

Recreation Department.

Plaintiff explains that the evidence clearly indicates that she wished to return to the Recreation Department. She states that Bixby's letter documents that she wished to stay in the Recreation Department because she liked her work there. In addition, in her September 3, 1999 rebuttal to the City's response to her charge of discrimination, Plaintiff notes that when she met with Wolfe in March to discuss her complaint, she requested that Recreation Department employees receive training to improve the situation there. Plaintiff argues that had she not wished to return to the Recreation Department, she would not have requested resolution of the problems there. Because she wished to return to the Recreation Department, but was denied that option after disclosing she was pregnant, Plaintiff concludes that there is a genuine issue of fact concerning whether her pregnancy "tainted" the decision. She cites Excel v. Bosley, 165 F.3d 635 (8th Cir. 1999) in support of her conclusion.

**The Court's Order.**

The Court grants Defendant's motion with respect to pregnancy discrimination. Plaintiff has failed to make out a prima facie case of pregnancy discrimination. Plaintiff's evidence satisfies the first two elements of a prima facie case by demonstrating that she was a member of a protected group, and she was qualified for her position. But Plaintiff has failed to produce evidence to demonstrate that she was discharged under circumstances giving rise to an inference of discrimination.

Viewing the facts in the light most favorable to the Plaintiff, there are insufficient material facts to satisfy the third element. The facts relevant to Plaintiff's pregnancy are that: (1) on March 10, 1999, after being given the three options, Plaintiff informed Wolfe that she was

pregnant; (2) on March 16, during her meeting with Wolfe and Schroeder, after Schroeder informed Plaintiff that there was no longer a third option, Plaintiff informed Wolfe and Schroeder that she was seven months pregnant; and (3) Kohls stated that when Schroeder informed her of Plaintiff's complaint, he stated that she was pregnant.

Plaintiff's entire argument is that the third option was taken away after she stated that she was pregnant. But that alone does not indicate that pregnancy was a motivating factor for removing the third option. During their discussion, Wolfe indicated that returning to the Recreation Department might not be possible, and that that option would require "quite a bit of employee assistance, team building, and other types of things to try to repair the relationships." In addition, Evans had already discussed with Wolfe her concerns over Plaintiff's work performance prior to Plaintiff mentioning that she was pregnant. These facts are entirely consistent with Defendant's explanation that Plaintiff was removed from the Recreation Department because of problems with employee relationships.

The Court acknowledges that the record contains statements from a number of different people indicating that the Recreation Department was an exceedingly difficult place to work, and Evans in particular was unpleasant to work with. But none of those statements, including Plaintiff's own complaint, ever suggested that it was a discriminatory environment. Further, Plaintiff's statements that she wished to return to the Recreation Department also do not somehow indicate that she must have been prevented from doing so because she was pregnant. Hence, none of these facts further the inference of discrimination.

As courts have explained:

> Demick is basically relying on "suspicious timing" to create a mosaic of circumstantial evidence, seeing as all the above evidence

> becomes important with respect to the timing of these changes or occurrences and Demick's birthday. However, "timing alone does not create an inference of discrimination." *Marshall,* 157 F.3d at 526 (citing *Hunt-Golliday v. Metro. Water*, 104 F.3d 1004, 1011 (7th Cir.1997)); *see also Piraino v. Int'l* Orientation Resources, Inc., 137 F.3d 987, 991 (7th Cir.1998) (holding that timing alone is insufficient). "Speculation based on suspicious timing alone, however, does not support a reasonable inference" of discrimination. *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir.2000) (citing *Stagman v. Ryan*, 176 F.3d 986, 1001 (7th Cir.1999)). "The mere fact that one event preceded another does nothing to prove that the first event caused the second." Id. Demick must show that other circumstances are present which reasonably suggest that the two events are somehow related to each other. Id. Specifically, Demick must show some type of connection between the City's actions (her being removed from the eligibility list) and her gender. Marshall, 157 F.3d at 526; *see also Cowan*, 123 F.3d at 444.

Demick v. City of Joliet, 135 F. Supp.2d 921, 934 (N.D. Ill. 2001).

And as another court stated more particularly, "Piraino must show some connection between her pregnancy and the adverse action taken against her. *See Ilhardt*, 118 F.3d at 1155. Piraino has come forward with no such evidence. She has not shown that if all the facts were identical but she were not pregnant, she would have been treated differently." Piraino v. International Orientation Res., Inc., 137 F.3d 987, 991 (7th Cir. 1998).

During oral argument, Defendant's counsel stated that there was clearly a timing issue, and clearly notification of pregnancy, but that Plaintiff had failed to show anything more. Plaintiff's counsel responded, and closed her case by stating, "there can be a perception that a woman who has little kids, especially an infant, might not be a dedicated employee. We can't speculate on what's in people's heads, but there are clearly enough facts to indicate there is a fact issue."

The Court has no doubt that the first part of Plaintiff's counsel's statement is correct.

And the current pregnancy discrimination law is clearly designed to respond to such unfair and frequently damaging misperceptions about pregnant women. But this fact can not mean that any Plaintiff who informed her employer that she was pregnant prior to losing an employment opportunity has automatically made out a prima facie case of pregnancy discrimination. The third element of the McDonnell Douglas test indicated there must be something more. And although Plaintiff presents many additional facts in an effort to avoid summary judgment, those facts do not make pregnancy discrimination a more reasonable inference. As the above-listed authority indicates, summary judgment is, therefore, appropriate.

**2. Retaliation.**

Defendant contends that "Plaintiff is unable to establish a prima facie case of retaliation because she cannot establish a causal connection between her charge of discrimination and the Ice Arena restructuring which resulted in the position elimination." Defendant explains that Plaintiff's mere filing of a complaint does not render illegal all of Defendant's subsequent actions affecting her employment. Moreover, Defendant argues that timing alone can not establish retaliatory intent. Finally, Defendant states that for financial reasons, Plaintiff's position would have been eliminated even if she had not filed a complaint. Therefore, Defendant concludes that summary judgment is appropriate on this claim as well.

Plaintiff responds that she has also made out a prima facie case of retaliation. She explains that she filed a grievance with Defendant and then an appeal of her grievance. She notes that Schroeder clearly felt threatened by the letter her lawyer sent to him. And less than a month later, on July 6, 1999, Wolfe sent a memo to the City Council with a plan to consolidate the Ice Arena with the Recreation Department. This proposal provided that Plaintiff's position, but no

other position, would be eliminated. Although the City rejected this proposal, Schroeder then presented several other options including 5(f). This option, which Schroeder urged, eventually resulted in the elimination of her position.

Plaintiff argues that this series of events raises a genuine issue of material fact concerning whether Defendant's adverse action was causally related to her complaint. She also states that there are genuine issues of material fact concerning Defendant's proffered reason for eliminating her position. She explains that,

> The ice arena reorganization report, which did not include elimination of Gulner's position, attributed the cost savings to the elimination of the ice arena manager position. The evidence, however, does not show any real cost savings from the elimination of the plaintiff's position of the restructuring of the ice arena staff, nor does the evidence show any real reason for the elimination of the position.

Plaintiff explains that paying Fredrickson to be a half-time manager would cost approximately $35,000, based on Plaintiff's estimate that his full-time salary was previously $70,000. When this figure is added to the salary for the newly hired full-time public service worker, Plaintiff concludes that the new budget likely did not save Defendant any money. In addition, Plaintiff states that if the Ice Arena's losing money over a large period was truly of concern to Defendant, it would not have hired her to work there in the first place.

Plaintiff further explains that there is a fact issue concerning whether the City Council actually directed the elimination of her position. She explains that none of the reports or minutes from the City Council meetings include any mention of eliminating her position. The only time this was mentioned, Plaintiff states, was during "Schroeder's discussion in the middle of a very long letter about the allocation of clerical duties," which "hardly suffices as a recommendation

for the elimination of plaintiff's employment." Plaintiff concludes that the City Council was never aware that her position would be eliminated, and their "approval of Option 5f hardly suffices as the requisite approval Schroeder needed to terminate plaintiff."

Plaintiff also argues that there is a fact issue concerning whether her position was eliminated, or merely renamed. Plaintiff emphasizes Kohls' suspicion that the clerical position had merely been renamed due to legal matters concerning Plaintiff. She explains that her "old job in the recreation department was a 20 hour part-time position, as was her ice arena position. The new position in the recreation department was a 40 hour position, confirming Kohls' testimony that the position was plaintiff's old job with a new title."

Finally, Plaintiff argues that Defendant's survey of other ice arenas could not have been the reason for eliminating her position. She explains that,

> for 25 years, according to the plaintiff's knowledge, the Cottage Grove ice arena has had a secretary working at the ice arena, and two months after the plaintiff filed her EEOC charge, the City eliminated her position to conform to what other arenas do. Interestingly, the five arenas in the "immediate area," the only five arenas included in the report, all had ice arena managers. So while th City asserts that it wished to copy what other arenas were doing with regard to part time clerical staff in the ice arena, the City was apparently not influenced by the fact that all the other arenas had ice arena manager positions when it proposed to eliminate the position of ice arena manager.

Finally, Plaintiff explains that "while Schroeder testified that other rinks did not employ full-time clerical staff, he did not 'recall' whether any arenas had half-time clerical positions. Plaintiff's position was half time."

**The Court's Order.**

The Court grants Defendant's motion with respect to the retaliation claim. Wolfe's proposal to restructure the Ice Arena followed Plaintiff's complaint quickly enough to produce a prima facie case. As the Eighth Circuit stated, "[o]ur cases hold that this temporal proximity is sufficient as a matter of law to establish the final required element in a prima facie case of retaliatory discharge. *See Keys*, 668 F.2d at 358 (less than two months); *Womack*, 619 F.2d at 1296 (twenty-three days)." Couty v. Dole, 886 F.2d 147, 148 (8th Cir. 1989). But Defendant has offered a legitimate, nondiscriminatory reason for its actions. Hence, Plaintiff is required to prove that the proffered reason is pretextual. Plaintiff has failed to do so.

Plaintiff's argument can only be that Schroeder, perhaps with the help of his staff, retaliated against Plaintiff by eliminating her position. Plaintiff argues that the City Council was never aware that it was eliminating her position. Therefore, its behavior can not demonstrate a causal connection between Plaintiff's complaint and the adverse employment action.

Plaintiff fails, however, to demonstrate that Schroeder took his actions in response to her complaint. Plaintiff's strongest facts are that: (1) she brought a complaint for pregnancy discrimination; (2) Schroeder was upset by the letter Plaintiff's attorney sent to him; and (3) Schroeder proposed a restructuring plan that included eliminating Plaintiff's position. The Court acknowledges these facts, but they do not demonstrate a causal connection to the elimination of Plaintiff's position.

Plaintiff's statement that only her position was eliminated is incorrect. The position of Ice Arena Manager was also eliminated. Mulso's resignation facilitated the entire process, and the first proposal to consolidate the Ice Arena and Recreation Department staff was made only

two weeks after his resignation, thus diminishing Plaintiff's own temporal proximity argument.

In addition, Plaintiff's argument that her position was merely renamed is not persuasive. Plaintiff argues that she formerly worked 20 hours per week in the Ice Arena and the Recreation Department, and that the newly created position in the Recreation Department was a 40 hour per week full-time position. Although Plaintiff was removed from the Recreation Department, her position there was never eliminated. And as the Court determined earlier, Plaintiff's removal from the Recreation Department did not constitute pregnancy discrimination. Therefore, the part-time position in the Recreation Department was not still her position at the time of the Ice Arena restructuring.

Plaintiff's arguments concerning the financial impact of the Ice Arena restructuring also do not demonstrate that Defendant's explanation for its actions is pretextual. Even if the final budget figures indicated less saving than Schroeder originally intended, this does not indicate that the restructuring was a pretext for dismissing Plaintiff. Instead, the City Council minutes and Schroeder's deposition testimony indicate that there were discussions back and forth concerning how to handle the work that Mulso and Plaintiff had previously performed. And these discussions were all conducted within the context of budget reform. Consequently, the Court can not find that Defendant's explanation was pretextual.

While timing is sufficient to make out a prima facie case, the Eighth Circuit has also indicated that in certain circumstances it is insufficient to advance a Plaintiff's case any further. See e.g. Nelson v. J.C. Penney Co., Inc., 75 F.3d 343, 346 (8th Cir. 1996); Caudill v. Farmland Industries, Inc., 919 F.2d 83, 86-87 (8th Cir.1990).

**THEREFORE, IT IS HEREBY ORDERED that:**

Defendant's Motion for Summary Judgment (Doc. No. 10) is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

Dated: July 1, 2002.

Susan Richard Nelson

SUSAN RICHARD NELSON
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*